# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:18-cv-00002-MR-WCM

| | | |
|---|---|---|
| SARA B. CONNER, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | **MEMORANDUM OF** |
| vs. | ) ) | **DECISION AND ORDER** |
| CLEVELAND COUNTY, NORTH CAROLINA, also known as Cleveland County Emergency Medical Services, | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

**THIS MATTER** is before the Court on the parties' Joint Motion for Order Approving Stipulations of Fact [Doc. 107]; the Defendant's Motion for Summary Judgment [Doc. 108]; and the Plaintiffs' Motion for Summary Judgment [Doc. 111].

## I.    PROCEDURAL BACKGROUND

On January 2, 2018, Sara B. Conner ("Conner") filed this action individually and on behalf of all others similarly situated against Defendant Cleveland County Emergency Medical Services ("CCEMS"), asserting claims for a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §

201 et seq., and a violation of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1 et seq.[1] [Doc. 1]. CCEMS filed its answer on January 30, 2018 [Doc. 3], and on May 1, 2018, Conner moved for leave to file an amended complaint [Doc. 15]. The Court granted Conner leave and Conner filed an Amended Complaint on June 5, 2018. [Doc. 22]. Conner's Amended Complaint asserts claims against CCEMS for a violation of the FLSA and for breach of contract under state law. [Id.]. CCEMS filed its answer to the Amended Complaint on July 2, 2018. [Doc. 27].

On November 13, 2018, Conner filed a Motion to Certify Class and Collective Action, seeking conditional certification of a collective action for the FLSA claim pursuant to 29 U.S.C. § 216(b) and certification of a class action for the breach of contract pursuant to Rule 23 of the Federal Rules of Civil Procedure. [Doc. 35]. On December 21, 2018, CCEMS filed a Motion to Dismiss Conner's claims. [Doc. 40]. On January 4, 2019, Conner responded to CCEMS's Motion to Dismiss. [Doc. 43]. On August 21, 2019, the Court adopted the Memorandum and Recommendation of the Honorable W. Carleton Metcalf, United States Magistrate Judge, dismissing Conner's FLSA claim with prejudice and declining to exercise supplemental jurisdiction over Conner's state law claim. [Doc. 59]. The Court therefore denied as

---

[1] The parties stipulated to the dismissal of the NCWHA claim on April 2, 2018. [Doc. 14].

moot Conner's Motion for Collective and Class Certification. [Id.]. Conner appealed this Court's dismissal, and on January 5, 2022, the Fourth Circuit issued an opinion vacating this Court's August 21, 2019, order, concluding that Conner had stated a cognizable claim for a FLSA violation and remanding for further proceedings on the merits of Conner's claims. Conner v. Cleveland Cnty., 22 F.4th 412, 429 (4th Cir. 2022).

On April 24, 2023, this Court granted Conner's Motion to Revive Motion for Collective and Class Certification; granted Conner's Motion for Collective and Class Certification for Conner's FLSA claim and breach of contract claim, respectively; and denied CCEMS's Motion to Dismiss Conner's breach of contract claim. [Doc. 84]. Initially, sixteen employees joined Conner's action [Docs. 91, 92, 93, 95], but seven of these individuals later revoked their consent to join the action [Docs. 99, 100, 101, 102], leaving Conner and eight opt-in plaintiffs (collectively, the "Plaintiffs").

On July 12, 2024, both parties moved for summary judgment on both the FLSA claim and the breach of contract claim. [Docs. 108, 111]. On July 26, 2024, both parties filed responses to the other party's motion. [Docs. 115, 116]. On August 9, 2024, both parties filed replies to the other party's response. [Docs. 119, 120]. On November 15, 2024, the Court issued an Order scheduling a hearing on the parties' motions for summary judgment.

3

[Doc. 122].  This hearing was held on December 18, 2024.  At the hearing, the Court asked the parties to provide the Court with a spreadsheet that contained the following information for each Plaintiff during the time covered by the Amended Complaint: (1) hours worked each week; (2) the amount owed each week; (3) the amount actually paid each week in both overtime and straight time; and (4) the difference between the amount owed and the amount actually paid each week.  The Court also permitted the parties to file supplemental briefs containing limited argument.  On January 31, 2025, the parties each filed briefs [Docs. 125, 126] and provided spreadsheets to the Court.  These motions are now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c). "When the facts are undisputed, summary judgment is appropriate only if one party is entitled to judgment as a matter of law."  Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1020 (4th Cir. 1997) (citing Fed. R. Civ. P. 56(c)).

4

Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). In doing so, however, the Court may only consider admissible evidence. Fed. R. Civ. P. 56; Evans v. Techs Applications Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

## III.  FACTUAL BACKGROUND

Here, the facts are not in dispute.[2]  Both parties argue that, based on the undisputed facts, they are entitled to summary judgment as a matter of law.

Conner[3] has been a full-time Emergency Medical Services ("EMS") employee at CCEMS since July 2007.  [Doc. 110-1: Conner's Deposition at 67–68].  As a full-time EMS employee at CCEMS, Conner was scheduled to work 24-hour shifts every third day, with 48 hours off in between (the "24/48 schedule").  [Id. at 117].  In any given seven-day workweek, CCEMS employees on the 24/48 schedule work either 48 or 72 hours.  This results

---

[2] The parties have submitted a Joint Motion for Order Approving Stipulations of Fact [Doc. 107].  Because the facts are not in dispute, the Court will deny the parties' Joint Motion as moot.

[3] The Court uses Conner's employment with CCEMS to illustrate the nature of each Plaintiff's employment and the scheme under which each Plaintiff was paid.

5

in a three-week recurring cycle whereby an employee will work a 48-hour week the first week, a 72-hour week the second week, and a 48-hour week the third week.[4]  [Id.].  Until 2018, CCEMS paid Conner based on the following facts and in the manner that follows.

## A.    The Ordinances

Cleveland County established a Code of Ordinances (the "Ordinances").  [Doc. 112-3: Ordinances].  The Ordinances contain a section entitled "Personnel" that governs Cleveland County employees, including CCEMS employees.  [Id. at 21].  The Personnel Section states that Cleveland County intends to provide overtime wages for all non-exempt employees pursuant to the FLSA.  [Id. at 32–33].

The Personnel Section also contains a payment system where jobs are classified and assigned a salary grade.  [Id. at 49–69].  Each salary grade corresponds with a range of minimum and maximum salaries for specific classifications of employees.  [Id.].  As of July 1, 2016, Conner's job classification was "EMT-Paramedic" [Doc. 110-1: Conner's Deposition at 67–68], which was assigned a salary grade 65, corresponding to a minimum

---

[4] For instance, in the first week the employee would work 24 hours on Monday and Thursday; the next week on Sunday, Wednesday, and Saturday; and the third week on Tuesday and Friday, resulting in a 48-hour week, followed by a 72-hour week, followed by another 48-hour week.  Then the cycle repeated.

6

annual salary of $33,606 and a maximum annual salary of $52,416 [Doc. 112-3: Ordinances at 56]. Within each salary grade, employees are assigned "Steps" and "Grades" that dictate the exact salary for each employee. [Id. at 67–69]. As of July 1, 2016, Conner was a Step 3, Grade 01 employee, placing her annual salary at $35,820.00. [Id. at 67; Doc. 112-11: Conner's Pay Stub 10/27/2016–11/16/2016 at 1].

## B. The Section 14 Pay Plan

In addition to the Ordinances, CCEMS fashioned Standard Operating Guidelines ("SOGs") that apply only to EMS employees. [Doc. 112-10: CCEMS SOGs at 5; Doc. 112-14: Lord Deposition at 12 (page 40 of the deposition)]. Section 14 of the SOGs contains a Pay Plan (the "Section 14 Pay Plan") that lays out the payment structure for 24/48 schedule employees. [Doc. 112-10: CCEMS SOGs at 19]. It is undisputed that all Plaintiffs were aware of the SOGs and the Section 14 Pay Plan. The Section 14 Pay Plan is the crux of this lawsuit.

Pursuant to the Section 14 Pay Plan, 24/48 schedule employees were to "be paid according to the revised semi-monthly, hourly, and overtime rates." [Id.]. The first step in ascertaining these three amounts is to calculate the hours that a 24/48 schedule employee would work in a calendar year. An employee working 40 hours per week would work a total of 2,080 hours

7

per year (52 weeks x 40 hours/week). However, an employee working 48 hours, 72 hours, and 48 hours in a repeating three-week cycle would work a total of 2,928 hours per year.[5]

Therefore, the base rate that such employee was to be paid (i.e., the salary) was for working the expected 2,928 hours. Therefore, according to the adopted Section 14 Pay Plan, the "hourly rate" that an EMS employee was to receive would be the annual salary figure divided by 2,928 hours, which was $12.23 per hour for Conner ($35,820.00/2,928 hours = $12.23 per hour). The overtime rate, therefore, was 1.5 times that base rate, which was $18.35 per hour for Conner ($12.23 x 1.5).

The calculation of the "semi-monthly rate" was much simpler. The employee was scheduled and expected to work 2,080 hours at the base rate per year. For Connor, that resulted in a base pay of $25,438.40 (2,080 hours x $12.23). This was then divided in 24 equal semi-monthly payments, which in the case of Conner was $1,060.00. It is undisputed that the Plaintiffs were aware that the Ordinances were construed in this way, and that any

---

[5] Three-week work cycles do not fit neatly into a 52-week calendar year. But in 51 weeks (17 cycles), an employee would work 2,856 hours. Assuming that the final week of the calendar year would be a 72-hour week, the total number of hours an EMS employee would work in a year was calculated to be 2,928 hours (2,856 + 72).

8

ambiguity in the Ordinances as they may apply to EMS workers were resolved in this manner.[6]  [Id.].

### C.    CCEMS's Payment Structure

Conner was paid twenty-four times per year, with paychecks issued on the 15th day of each month (or on the preceding Friday if the 15th fell on a Saturday, Sunday, or Monday holiday) and the last day of each month (or the preceding Friday if the last day of the month fell on a Saturday, Sunday, or Monday holiday).  [Doc. 112-12: 2016 Pay Periods at 3; Doc. 112-13: 2017 Pay Periods at 3].  Therefore, some semi-monthly pay periods accounted for three weeks of work, while other pay periods accounted for two weeks of work.[7]  [Doc. 112-12: 2016 Pay Periods at 3; Doc. 112-13: 2017 Pay Periods at 3].  Each pay period, Conner was paid (1) her base "revised semi-monthly rate," and (2) her overtime based on the number of overtime hours on her time sheets multiplied by her overtime rate.  [Doc. 112-11: Conner's Pay Stub 10/27/2016–11/16/2016 at 1].

---

[6] In 2018, CCEMS amended the Section 14 Pay Plan and removed the "revised semi-monthly rate" calculation.  [Doc. 116-1 at 2].  At this point, CCEMS calculated the base rate by dividing the salary listed in the Ordinances by 24 (but kept the same overtime rate calculation).  [Id.].  The parties not dispute herein whether this amended plan comports with the FLSA.

[7] Since a year consists of 52 weeks, in an ordinary year 20 pay periods would account for two weeks while four pay periods would account for three weeks.

This payment scheme created discrepancies in Conner's pay. Because CCEMS paid a set "revised semi-monthly rate" each pay period for all of her non-overtime work, during the pay periods that accounted for three weeks of work CCEMS paid Conner substantially less per hour than the hourly rate devised in the Section 14 Pay Plan. During the pay periods that accounted for two weeks of work, however, CCEMS paid Conner incrementally more than the hourly rate devised in the Section 14 Pay Plan. Over the course of a year, though, these discrepancies evened out, and Conner was paid what she was owed under the Section 14 Pay Plan.

To illustrate, from July 1, 2016, to June 30, 2017, Conner's annual salary per the Ordinances was $35,820.00. [Doc. 112-11: Conner's Pay Stub 10/27/2016–11/16/2016 at 1]. Pursuant to the Section 14 Pay Plan, Conner's "revised semi-monthly rate" was $1,060.00, her base hourly rate was $12.23, and her overtime hourly rate was $18.35. [Id.]. During a pay period that accounted for two weeks of work, March 2, 2017, to March 15, 2017, Conner worked 96 hours—80 base hours and 16 overtime hours. [Doc. 112-13: Conner's Pay Stub 3/2/2017–3/15/2017 at 1]. For this two-week period, Conner was again paid a "revised semi-monthly rate" of $1,060.00—resulting in a base rate of $13.25 per hour ($1,060.00 ÷ 80 = $13.25). [Id.]. It is undisputed that she was also paid for her 16 hours of

10

overtime at the rate of $18.35 per hour. During a pay period that accounted for *three weeks* of work, October 27, 2016, to November 16, 2016, Conner worked 170.25 hours—120 base hours and 50.25 overtime hours. [Id.]. Conner was paid $1,060.00 as her "revised semi-monthly rate" and an additional $922.09 for the 50.25 overtime hours. [Id.]. Based on Conner's base pay for this pay period—$1,060.00—and the number of base hours Conner worked during this period—120—Conner was paid only $8.83 per hour before overtime ($1,060 ÷ 120 = $8.83).

From July 1, 2016, to June 30, 2017, Conner was paid in two-week pay periods twenty times (40 weeks) and three-week pay periods four times (12 weeks). [Doc. 112-11 at 3]. Thus, Conner was paid $13.25 per hour during the two-week pay periods (of which there were twenty during a calendar year), and she was paid $8.83 per hour during the three-week periods (of which there were four during the calendar year). However, over the course of all 2,080 non-overtime hours during the calendar year, this aggregates to $12.23 per hour in accord with the Section 14 Pay Plan. Therefore, over the course of the calendar year, Conner was paid her non-overtime wages in full.

The Plaintiffs contend that the Defendant's calculation of the "revised semi-monthly rate" violated their employment agreements as well as the FSLA.

11

## IV. DISCUSSION

### A. Breach of Contract

In order to address both of the claims asserted by the Plaintiffs, the Court must first determine what the parties agreed to regarding employment, and whether CCEMS has failed to abide by such agreement.

To prevail on a breach of contract claim under North Carolina law, a party must show "(1) existence of a valid contract and (2) breach of the terms of that contract." One Beacon Ins. Co. v. United Mech. Corp., 700 S.E.2d 121, 124 (N.C. Ct. App. 2010) (citation omitted). A contract is "a promise supported by consideration, which arises when the terms of an offer are accepted by the party to whom it is extended." McLamb v. T.P. Inc., 619 S.E.2d 577, 580 (N.C. Ct. App. 2005) (citations and ellipsis omitted). A unilateral contract is "a promise by one party or an offer . . . to do a certain thing in the event the other party performs a certain act." White v. Chatham Mem'l Hosp., Inc., 387 S.E.2d 80, 81 (N.C. Ct. App. 1990) (citation omitted). An offeree can accept a unilateral contract by performance. Wray v. City of Greensboro, 787 S.E.2d 433, 437 (N.C. Ct. App. 2016).

Unilateral employment contracts can be formed by county ordinances. See Bolick v. County of Caldwell, 641 S.E.2d 386, 389 (N.C. Ct. App. 2007) ("We believe the nature of the ordinance at issue . . . turns this action into

one based on contract . . . .").  Terms of unilateral employment contracts can also be found in employment materials.  See White, 387 S.E.2d at 81 (determining that statements in an employer's personnel book constituted evidence of an offer, and the employee's continued employment constituted evidence of acceptance); see also Cheek v. City of Greensboro, 152 F. Supp. 3d 473, 477 (M.D.N.C. 2015) ("If an employer distributes materials that promise certain benefits, the promises are enforceable, and the employer must provide the benefits promised until it clearly informs employees of a change in the benefits offered." (citations and internal quotation marks omitted)).

Local governments "may generally alter benefits, make them more generous or less generous, or eliminate any or all of them—just as they may give pay raises or order across-the-board salary freezes or cuts."  Cheek, 152 F. Supp. 3d at 476 (citations omitted).  "[A]n employee accepts an employer's unilateral offer to provide benefits by entering or continuing employment."  Id. at 477 (citations omitted).  Despite the unilateral nature of local government employment contracts, "[p]ersons entering contracts . . . have a duty to read them and ordinarily are charged with knowledge of their contents."  State Farm Mut. Auto. Ins. Co. v. Gaylor, 660 S.E.2d 104, 107 (N.C. Ct. App. 2008); see also Cheek, 152 F. Supp. 3d at 482 ("To the extent

the plaintiffs contend they did not read [its Personnel Manual, Employee Handbooks, and Benefit Books], that is of no moment." (citation omitted)). Thus, employers are generally bound by the terms of materials that they distribute, and employees are generally bound by materials in effect any day they show up for work.  Id.

Here, the Plaintiffs argue that CCEMS breached the Plaintiffs' employment contracts because CCEMS failed to pay the Plaintiffs the salary listed in the Ordinances.  [Doc. 112 at 8–19].  The Plaintiffs claim that CCEMS breached by dividing the stated annual salary by the total number of hours each EMS employee was expected to be scheduled to work (2,928 hours), rather than the total number of *non-overtime* hours that were anticipated (2,080).  CCEMS argues that it did not breach the Plaintiffs' employment contracts because it paid the Plaintiffs in accord with the Section 14 Pay Plan, which is part of the employment contract.  [Doc. 109 at 15–17]. To resolve the Plaintiffs' breach of contract claim, the Court must determine (1) the components of the Plaintiffs' employment contracts, and (2) whether the Plaintiffs were paid accordingly.

It is undisputed that the Ordinances form the basis of the Plaintiffs employment contracts.  See Bolick, 641 S.E.2d at 389.  The Plaintiffs also do not dispute that they knew of the SOGs and the Section 14 Pay Plan while

14

employed at CCEMS. Yet, the Plaintiffs all continued to work and continued to accept payment pursuant to the Section 14 Pay Plan. By doing so, North Carolina law dictates that the Plaintiffs accepted the terms of, and, thus, the calculations contained in, the Section 14 Pay Plan. See White, 387 S.E.2d at 81; see also Cheek, 152 F. Supp. 3d at 477. Based on these undisputed facts, the Court concludes that the Plaintiffs' employment contracts consist of the Ordinances and the SOGs. See Bolick, 641 S.E.2d at 389; see also White, 387 S.E.2d at 81; Cheek, 152 F. Supp. 3d at 477. And the SOGs incorporate the Section 14 Pay Plan into that contract. Id.

The Plaintiffs argue that "[r]egardless of whether the Plan was a component of [their] . . . employment contract[s], the 'revised semi-monthly rate' calculation is both unenforceable and unlawful because . . . it directly conflicts with the Ordinances." [Doc. 116 at 12]. The SOGs, however, are not at odds with the Ordinances. In the Section 14 Pay Plan, CCEMS applies the annual salary listed in the Ordinances to calculate what to pay its employees. This is the contract between the parties. In fact, this is the law of the case. On the Plaintiffs' previous appeal, the Court of Appeals held that "[o]f course, the parties can contract to calculate wages in this way, subject to minimum wage provisions." Conner, 22 F.4th at 418 n.3. The Plaintiffs were paid precisely what they were owed according to the specific terms of

the Section 14 Pay Plan contained in the SOGs, and that hourly rate comported with the minimum wage requirements.[8]    [See Doc. 126 and accompanying spreadsheet].

The Plaintiffs argue that the Ordinances and the Section 14 Pay Plan are directly at odds because the Ordinances deem the Plaintiffs to be salaried employees, and thus "[t]hese employees are not paid on an 'hourly rate of pay.'"  [Doc. 125 at 2].  This view was clearly rejected by the Fourth Circuit.  Conner, 22 F.4th at 418 n.3.  The Ordinances and the Section 14 Pay Plan can easily be read in harmony, and the Plaintiffs undoubtedly accepted their employment and their pay in accord with that harmonized reading.  Accordingly, there was no breach of contract.

For these reasons, the Court will grant CCEMS's motion for summary judgment, and deny the Plaintiffs' motion for summary judgment, as to the Plaintiffs' breach of contract claim.

---

[8] CCEMS admits that it inadvertently underpaid the overtime of Plaintiff Cleveland Potts during the pay period of January 12, 2017, to January 26, 2017, by $547.52.  [Doc. 126 at 3–4 n.2].  As the Plaintiffs have not made a claim for unpaid overtime compensation in this case, the Court need not address this inadvertent underpayment here.

## B. FLSA

Having determined that the Section 14 Pay Plan constituted an integral part of the Plaintiffs' employment contracts, the Court now turns to the question of whether that payment structure violated the FLSA.

The FLSA protects workers by requiring employers "to pay their employees both a minimum wage and overtime pay." Conner, 22 F.4th at 420 (quoting Hall v. DIRECTV, LLC, 846 F.3d 757, 761 (4th Cir. 2017)). Under the FLSA, employers are required to pay "at least the federal minimum wage" and "not less than time and a half for each hour worked over forty hours during a workweek." Id. (citing 29 U.S.C. §§ 206(a)(1) and 207(a)(1)).

There are situations where employees seek redress for wages for "uncompensated hours worked that 'fall between the minimum wage and the overtime provisions of the FLSA.'" Id. at 421 (quoting Davis v. Abington Mem'l Hosp., 765 F.3d 236, 243 (3rd Cir. 2014)). This type of claim is one for "gap time," or "time that is not directly covered by the FLSA's overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the FLSA's minimum wage provisions because the employees are still being paid a minimum wage." Id. (quoting Davis, 765 F.3d at 243–44) (brackets and ellipsis omitted). "There are two types of gap time—pure gap time," where an "employee seeks to recover for unpaid

straight time[9] in a week in which they worked no overtime," and "overtime gap time," where an "employee seeks to recover unpaid straight time for a week in which they *did* work overtime." Id. (citing <u>Monahan v. County of Chesterfield</u>, 95 F.3d 1263, 1266 (4th Cir. 1996)). The Plaintiffs assert a claim for "overtime gap time."

This Court previously dismissed the Plaintiffs' FLSA claim for failure to state a claim. <u>Conner v. Cleveland Cnty.</u>, 2019 WL 3948365 (W.D.N.C. Aug. 21, 2019) [Doc. 59]. The Court determined that, by asking for only straight time compensation, instead of overtime compensation, the Plaintiffs did not state a valid claim for a violation of the FLSA. Id. at *2. The Fourth Circuit disagreed and recognized overtime gap time claims, determining a viable claim exists under the FLSA for compensation of unpaid straight time wages when an employee is entitled to overtime wages, even when the employee is paid her overtime wages. <u>Conner v. Cleveland Cnty.</u>, 22 F.4th 412, 423 (4th Cir. 2022).

Now, the Plaintiffs argue that, even though CCEMS paid their overtime in full, the Plaintiffs are entitled to summary judgment because CCEMS underpaid their straight time wages. Specifically, the Plaintiffs assert that the

---

[9] "Straight time" compensation refers to the base salary an employee would earn if they did not work overtime hours during a given workweek.

overtime rate calculated in the Section 14 Pay Plan is correct and applicable but argue that they were not paid the salaries (i.e., straight time) that they were owed pursuant to the Ordinances. [Doc. 116 at 19; Doc. 120 at 8 ("Plaintiffs do not dispute that the Plan's overtime calculation satisfies the requirements of the FLSA." (emphasis omitted)); Doc. 123 at 4]. The Plaintiffs' argument is premised on the idea that the Plaintiffs should have been paid their stated annual salaries as listed in the Ordinances as their *base* pay. [Doc. 125]. Again, however, the Plaintiffs' employment contracts do not dictate that they be paid the salaries listed in the Ordinances as calculated by the Plaintiffs. The Plaintiffs were contractually owed the salaries as calculated in the Section 14 Pay Plan. When applying the Ordinances to a 24/48 schedule employee, the Ordinances are at best unclear. The Section 14 Pay Plan clarifies how to apply the Ordinances, and the Plaintiffs were paid accordingly.

The Plaintiffs' argument in this regard is entirely inconsistent. If the payment of overtime was correct, then the hourly rate paid for those 848 hours (2,928 minus 2,080) must likewise be correct.[10] Therefore, the regular rate would be exactly 2/3 of that overtime rate and would be paid for the

---

[10] By admitting that the overtime rate found in the Section 14 Pay Plan is correct and lawful, the Plaintiffs effectively concede that the Section 14 Pay Plan is included in their employment contracts.

2,080 hours of non-overtime work.  That is *precisely* what the Plaintiffs were paid in accord with the Section 14 Pay Plan.

That, however, is not the end of the analysis.  The decision of the Fourth Circuit dictates a different approach to the question of whether the Defendant's employment agreement violates the FLSA.  The Court of Appeals provided an example to show how an employer can violate the FLSA by depriving its employees of overtime gap time pay.  Conner, 22 F.4th at 423 (citation omitted).  The Fourth Circuit stated:

> [A]ssume an employee's salary is $1,500 each work week for straight-time wages, and in a given work week, the employee earns $750 in overtime pay. Instead of issuing the employee a paycheck for $2,250, the employer issues a paycheck in the amount of $1,750.  The paystub designates a payment of $1,000 as "salary" and $750 as "overtime compensation."  In this scenario, there is a violation of the overtime provisions of the FLSA . . . because it is improper to designate $750 as "overtime pay" without first having paid all straight-time wages. Effectively, the employer has only paid the employee $250 in overtime pay out of the $750 owed.

Id. at 422–23.  The Fourth Circuit later articulated the test for courts to evaluate overtime gap time claims, explaining:

> The test is not whether the underlying employment agreement facially violates either the minimum wage or maximum hour requirements. . . .  Instead, to determine whether there is an overtime gap time claim, **we look to whether the straight time wages have been paid pursuant to the terms of the**

> **employment agreement**. If the straight time wages have not been paid as such, and an employee works overtime that week, then there could be an overtime gap time claim.

Id. at 429 (emphasis added).

Both the Fourth Circuit's example and test analyze the application of the FLSA to each individual work week. Pursuant to the Section 14 Pay Plan, CCEMS paid each Plaintiff a set amount of base pay each semi-monthly pay period, while paying each Plaintiff fluctuating amounts of overtime pay based on overtime hours worked. Thus, for the pay periods that accounted for three weeks of work, which included 120 hours of non-overtime pay, the Plaintiffs' base hourly *pay* was less than their base hourly *rates*. Therefore, for these pay periods, the Plaintiffs were undercompensated. This constitutes a per se violation of the FLSA. Accordingly, the Court will grant the Plaintiffs' motion for summary judgment, and deny CCEMS's motion for summary judgment, as to the FLSA claim.

### C. Damages

Employers that violate the FLSA are liable for unpaid overtime compensation. 29 U.S.C. § 216(b). The Plaintiffs concede, however, that they have been paid all the overtime they are due. In an overtime gap time claim the employee can recover any unpaid base pay.

21

At the December 18, 2024 summary judgment hearing, the Court asked the parties to provide the Court with a spreadsheet that contained the following information for each Plaintiff during the time covered by the Amended Complaint: (1) hours worked each week; (2) the amount owed each week; (3) the amount actually paid each week in both overtime and straight time; and (4) the difference between the amount owed and the amount actually paid each week. Neither party followed these instructions particularly well at all. The Defendant used the column headings as instructed, but allocated the base payments to dates entirely at odds with the pay records submitted for the summary judgment motions. The Plaintiffs did not even use the column headings as instructed. Nonetheless, the Court has been able to discern from the pay records submitted that each of the Plaintiffs was paid the total amount of base pay that was owed. Even though over the course of a year the Plaintiffs were routinely shorted in their base pay during the four pay periods comprised of three work weeks, the Plaintiffs were overpaid during the other twenty pay periods, which made up the difference—usually in advance. As such, even though the Court concludes that there is a technical violation of the FLSA by the Defendant's Section 14 Pay Plan arrangement, the Plaintiffs have no resulting overtime gap time

claim losses. As a result, the Plaintiffs shall recover nothing by way of this action.

## V.    CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment is granted as to the Plaintiffs' FLSA claim and denied as to the Plaintiffs' breach of contract claim. CCEMS's motion for summary judgment is granted as to the Plaintiffs' breach of contract claim and denied as to the Plaintiffs' FLSA claim. The Court concludes, however, that the undisputed evidence shows that the Plaintiffs have no loss arising from such technical FLSA violation, and therefore they shall recover nothing from the Defendant.

### ORDER

**IT IS, THEREFORE, ORDERED** that:

1.    The parties' Joint Motion for Order Approving Stipulations of Fact [Doc. 107] is **DENIED AS MOOT**.

2.    The Plaintiffs' Motion for Summary Judgment [Doc. 111] is **GRANTED IN PART AND DENIED IN PART**. The Plaintiffs' Motion is **DENIED** as to the Plaintiffs' claim for breach of contract. The Plaintiffs' Motion is **GRANTED** as to the Plaintiffs' claim under the FLSA. The Plaintiffs, however, shall have and recover nothing

23

on the FLSA claim as the undisputed evidence shows that the Plaintiffs incurred no loss as a result of the Defendant's technical violation.  As such, the Plaintiffs shall recover a judgment against the Defendant in the amount zero dollars ($0).  The costs of this action are taxed against the Defendant.

3. The Defendant's Motion for Summary Judgment [Doc. 108] is **GRANTED IN PART AND DENIED IN PART**.  Specifically, the Defendant's Motion is **DENIED** as to the Plaintiffs' claim under the FLSA.  The Defendant's Motion is **GRANTED** as to the Plaintiffs' claim for breach of contract, and the Plaintiffs' claim for breach of contract is hereby **DISMISSED WITH PREJUDICE**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: March 31, 2025

Martin Reidinger
Chief United States District Judge